IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Judge Philip A. Brimmer**

Civil Case No.  08-cv-00580-PAB-KLM

VANESSA FUCHS and
BETHANY FUCHS,
a child through her next friend VANESSA FUCHS,

      Plaintiffs,

v.

ANTHONY SANDERS,

      Defendant.

_____

## ORDER GRANTING SUMMARY JUDGMENT
_____

      This matter is before the Court on defendant Anthony Sanders' motion for summary judgment [Docket No. 35], filed on January 12, 2009.  Plaintiffs responded to the motion on February 2, 2009 [Docket No. 38] and defendant filed a reply brief on February 17, 2009 [Docket No. 51].  The Court held a hearing on the motion on August 28, 2009.  Defendant Sanders raises the defense of qualified immunity in his motion.  To survive summary judgment, therefore, plaintiffs must demonstrate that defendant Sanders violated their constitutional rights that were clearly established at the time of the conduct giving rise to this litigation.  Upon consideration of the arguments and authorities relied on by the parties in their briefs and at oral argument, the Court concludes that plaintiffs have not met their burden to show a violation of their clearly established constitutional rights and, accordingly, summary judgment must enter in defendant's favor.

## I.  FACTUAL BACKGROUND

Vanessa and Bethany Fuchs filed this lawsuit as a result of an incident that occurred on April 14, 2006, during which they were confronted by defendant Sanders, then an Arapahoe County deputy sheriff, in the course of his response to a police dispatch regarding a garage burglary.  The series of events that transpired that day are undisputed unless otherwise noted.  At approximately 10:50 a.m., a burglar stole a set of golf clubs from a homeowner's open garage and, following a brief encounter with the homeowner that stripped him of his outer shirt or sweatshirt, the burglar fled the scene. Def.'s Mot. for Summ. J. ("MSJ"), Ex. A-9, Attach. 1 at 1-3.  The victim called the police and reported that the burglar departed in a "regular four door," "blue-ish" vehicle bearing the license plate number 151-KUI.  *Id.* at 1.  Defendant Sanders, who was on patrol in a marked car, received the following dispatch at approximately 11:00 a.m. that day:

> It's a white male in his early twenties, brownish, black hair, about six feet tall, thin build, jeans and an unknown shirt.  Could be associated with a blue, four door vehicle, plate number 151 King, Union, Ida.  Last seen going southbound on Olathe . . . . The [victim] did grab him by the shirt, when he caught him, and . . . the [victim] still has the shirt.  The full set of women's golf clubs is what's missing.

*Id.* at 4.  Defendant Sanders ran a computer search from his patrol car on the license plate number reported by the homeowner and identified it as belonging to a 2005 blue Honda passenger van registered to Mrs. Fuchs' address.  MSJ ¶ 4; Pl.'s Resp. to MSJ ("Resp.") ¶ 4.  Defendant Sanders then drove to Mrs. Fuchs' address to see if he could locate the burglary suspect.  MSJ ¶ 5; Resp. ¶ 5.  Defendant Sanders also requested that the Aurora Police Department send an officer to Mrs. Fuchs' address.  MSJ ¶ 6; Resp. ¶ 6.

2

At approximately 11:15 a.m., defendant Sanders arrived at Mrs. Fuchs' house and parked nearby.  Resp., Ex. 2 at 4.  After a minute or two, defendant Sanders saw a 2005 blue Honda passenger van approaching with the license plate number 151 KUI – the same one reported by the burglary victim.  MSJ ¶ 7; Resp. ¶ 7.  Mrs. Fuchs was driving this van.  Resp. ¶ 2.  Her daughter Bethany, age six, was in the second row of seats in the van.  Resp., Ex. 3 at 5.  Mrs. Fuchs passed defendant Sanders' patrol car and parked in her driveway.  MSJ ¶ 8; Resp. ¶ 8.  Defendant Sanders made a u-turn and parked his patrol car along the curb approximately fifteen to twenty feet away from Mrs. Fuchs' van, at an angle to it.  *Id.*  While defendant Sanders was still in his patrol car, Mrs. Fuchs got out of the van.  MSJ ¶ 10; *deemed admitted*, Resp. ¶ 10.  She was dressed in jeans and a blue shirt, with her hair in a bun.  MSJ ¶ 10; Resp., Ex. 2 at 18 & Ex. 6 at 7.  Defendant Sanders got out of his vehicle and pointed his gun at Mrs. Fuchs while ordering her to get down on the ground.  MSJ ¶ 13; Resp. ¶ 13.  Defendant Sanders testified that, although he recognized at the time that Mrs. Fuchs was clearly shorter than six feet (she is five feet one inch tall), he still thought that she might be the suspect when he pointed his gun at her.  Resp., Ex. 2 at 8, 16 & Ex. 6 at 9.

Defendant Sanders recalls that Bethany Fuchs got out of the rear driver's side door of the van as Mrs. Fuchs was getting down on the ground.  MSJ ¶ 15; *see also* Resp., Ex. 2 at 5 ("I start ordering commands . . . . At which point in time the person walks over into the grass and gets on the ground . . . . And at that point in time, a little child from the back side, also driver's side of the van, comes popping out of the van . . . .").  Plaintiffs, however, claim that both Mrs. Fuchs and Bethany Fuchs exited their vehicle at approximately the same time and that defendant Sanders pointed his gun in

3

their general direction.  Resp. ¶ 15.  Bethany Fuchs testified that she and her mother

got out of the van "at the same time," but on further questioning stated that her mother

"got out a little before me."  MSJ, Ex. A-5 at 19.  Mrs. Fuchs testified that as she was

stepping out of the van, the rear passenger door from which Bethany exited was

already open. Resp., Ex. 1 at 10.  The record shows that defendant Sanders pointed

his gun only at Mrs. Fuchs during this incident.  MSJ, Ex. A-4 at 12.

After defendant Sanders had repeated his command to Mrs. Fuchs about three

times, she complied by lying down on her stomach in the grass next to her driveway.

Resp., Ex. 1 at 4 & Ex. 2 at 5.  While Mrs. Fuchs complied with defendant Sanders'

order, Bethany Fuchs was running back and forth between Mrs. Fuchs and the van,

screaming "leave mommy alone" and "don't hurt my mommy."  MSJ ¶ 16; Resp, Ex. 1

at 4.  Defendant Sanders ordered Bethany Fuchs to stay away from her mother or to go

back to the van.  MSJ ¶ 17; Resp. ¶ 17.  Once Mrs. Fuchs was on the ground in a

prone position, Defendant Sanders approached the van to get what he describes as a

"quick peek" into the van, confirming that no other person was visible in the front or

back seats of the van.  MSJ, Ex. A-2 at 6; Resp., Ex. 6 at 7, 8.  In his deposition in this

case, defendant Sanders testified that he did not see anybody else in the van.  MSJ,

Ex. A-2 at 6.  The day after the incident, defendant Sanders reported that he was not

able to see into the rear cargo portion of the van when he checked it before placing

Mrs. Fuchs in handcuffs.  Resp. Ex. 6 at 8.  Defendant Sanders holstered his gun,

Resp., Ex. 6 at 10, and then handcuffed Mrs. Fuchs.  MSJ, Ex. A-2 at 6.  Defendant

Sanders reported that while he checked the van and handcuffed Mrs. Fuchs, Bethany

Fuchs continued to run around between the van and her mother, screaming.  MSJ, Ex.

4

A-1, Attach. 1 at 3; Resp., Ex. 6 at 7.  Shortly after defendant Sanders placed Mrs.

Fuchs in handcuffs, Bethany Fuchs opened the rear hatch of the van, apparently in

response to defendant Sanders asking Mrs. Fuchs where the golf clubs were and

whether he could check the van to see if there were golf clubs in it.  MSJ, Ex. A-2 at 18-

19.  About this same time, an officer from the Aurora Police Department arrived at the

scene.  MSJ, Ex. 1, Attach. 1 at 4.  Defendant Sanders looked in the cargo area of the

van through the open rear hatch, finding neither golf clubs nor another person in the

van.  MSJ, Ex. A-2 at 19.  At this point, defendant Sanders radioed a deputy who was

at the burglary scene.  MSJ ¶ 21; Resp. ¶ 21.  After obtaining confirmation through the

victim that the suspect vehicle was not a van, but a sedan, defendant Sanders uncuffed

Mrs. Fuchs, apologized to her and Bethany Fuchs, and told Bethany Fuchs that her

mother was not going to jail.  MSJ ¶¶ 22-23 & Ex. A-2 at 19-20; Resp. ¶¶ 22-23.

Mrs. Fuchs testified to the duration of her encounter with defendant Sanders as

follows: She believes it took about forty-five seconds total from the time that she first

saw defendant Sanders on the curb near her driveway to the time that he had

handcuffed her on the ground.  Resp., Ex. 1 at 7.  Mrs. Fuchs estimates she was

handcuffed for two to three minutes.  *Id.* at 8.  Defendant Sanders then removed the

handcuffs and Mrs. Fuchs stood up without assistance.  *Id.*  Mrs. Fuchs recalls a minute

to a minute-and-a-half passing after she was uncuffed before she entered her home.

*Id.* at 9.  The police radio broadcast concerning this incident shows that defendant

Sanders spotted Mrs. Fuchs' van approaching her home at 11:15 a.m.  MSJ, Ex. A-9,

Attach. 1 at 6.  The dispatch transcript shows that defendant Sanders radioed to deputy

Martinez at 11:18 a.m., stating that he had Mrs. Fuchs detained and inquiring whether

5

she was the correct suspect.  *Id.* at 6-7.  At approximately 11:23 a.m., Defendant

Sanders confirmed over the police radio that he would release Mrs. Fuchs and the

emergency channel resumed normal use.  *Id.* at 8.

## II.  ANALYSIS

### A.  Standard of Review

Summary judgment is warranted under Federal Rule of Civil Procedure 56(c)

when "the pleadings, the discovery and disclosure materials on file, and any affidavits

show that there is no genuine issue as to any material fact and that the movant is

entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); *see Anderson v. Liberty

Lobby, Inc.*, 477 U.S. 242, 248-50 (1986); *Concrete Works, Inc. v. City & County of

Denver*, 36 F.3d 1513, 1517 (10th Cir. 1994).  A disputed fact is "material" if under the

relevant substantive law it is essential to proper disposition of the claim.  *Wright v.

Abbott Labs., Inc.*, 259 F.3d 1226, 1231-32 (10th Cir. 2001).  Only disputes over

material facts can create a genuine issue for trial and preclude summary judgment.

*Faustin v. City & County of Denver*, 423 F.3d 1192, 1198 (10th Cir. 2005).  An issue is

"genuine" if the evidence is such that it might lead a reasonable jury to return a verdict

for the nonmoving party.  *Allen v. Muskogee*, 119 F.3d 837, 839 (10th Cir. 1997).

When reviewing a motion for summary judgment, a court must view the evidence in the

light most favorable to the non-moving party.  *Id.*

### B.  Evaluation of Claims

#### 1.  Qualified Immunity

Because defendant Sanders asserts the defense of qualified immunity, the Court

begins by outlining the relevant standards under that doctrine.  In *Harlow v. Fitzgerald*,

457 U.S. 800 (1982), the Supreme Court held that "government officials performing

discretionary functions generally are shielded from liability for civil damages insofar as

their conduct does not violate clearly established statutory or constitutional rights of

which a reasonable person would have known."  *Id.* at 818.  Whether a defendant is

entitled to qualified immunity is an issue to be addressed by the Court at its earliest

opportunity, since the doctrine shields government officials not only from liability, but

from the obligation to stand trial or engage in pretrial proceedings altogether.  *Holland*

*ex rel. Overdorff v. Harrington*, 268 F.3d 1179, 1185 (10th Cir. 2001) (quoting *Saucier v.*

*Katz*, 533 U.S. 194, 200-01 (2001)).

A government official need only assert qualified immunity to shift the burden to

the plaintiff to "show with particularity facts and law establishing the inference that

defendant violated a constitutional right" and that the right allegedly violated was

"clearly established at the time of the conduct at issue."  *Hollingsworth v. Hill*, 110 F.3d

733, 737-38 (10th Cir. 1997); *Bruning v. Pixler*, 949 F.2d 352, 356 (10th Cir. 1991)

("plaintiff must produce facts sufficient to show both that the defendant's alleged

conduct violated the law and that that law was clearly established when the alleged

violation occurred").  If a plaintiff establishes a violation of clearly established law, then

the burden shifts back to the government official to prove that there are no genuine

issues of material fact and that he is entitled to judgment as a matter of law.  *Clark v. Edmunds*, 513 F.3d 1219, 1222 (10th Cir. 2008).  Stated differently, if a clearly established constitutional right was violated, the defendant must "prove that he neither knew nor should have known of the relevant legal standard" to maintain the qualified immunity defense.  *Harlow*, 457 U.S. at 818-19.

In *Pearson v. Callahan*, 129 S.Ct. 808, 818 (2009), the Supreme Court held that "judges of the district courts and the courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand."  In this case, the Court first addresses the issue of whether plaintiffs have shown that defendant Sanders violated their constitutional rights under the Fourth Amendment[1].  Because this inquiry is dispositive, the Court need not inquire into whether the relevant law was clearly established at the time of the encounter between defendant Sanders and plaintiffs.

### 2. Bethany Fuchs' Fourth Amendment Claims

Plaintiff Bethany Fuchs argues that she was unreasonably seized and subjected to excessive force by defendant Sanders.  Bethany Fuchs' unreasonable seizure claim stems from defendant Sanders' conduct of ordering "her to stay by the minivan, while

---

[1] "[T]he Fourth Amendment applies against state law enforcement officials as incorporated through the Due Process Clause of the Fourteenth Amendment."  *United States v. Rodriguez-Rodriguez*, 550 F.3d 1223, 1225 n.1 (10th Cir. 2008) (citing *Mapp v. Ohio*, 367 U.S. 643, 655 (1961)).  Accordingly, the Court refers only to the Fourth Amendment in analyzing plaintiffs' claims.

pointing a loaded gun at Mrs. Fuchs and in Bethany's general direction." Resp. at 12.

Plaintiffs also contend that defendant intended to seize all occupants of the minivan

and that his show of authority using a firearm caused Bethany Fuchs to believe she was

not free to leave the scene.  Defendant Sanders counters that he never intended to

seize Bethany Fuchs, that he never pointed his gun at her, and that she did not comply

with his command to stay away from her mother.  Under the facts before the Court, no

seizure occurred within the meaning of the Fourth Amendment.

The Fourth Amendment to the United States Constitution protects the "right of

the people to be secure in their persons, houses, papers, and effects, against

unreasonable searches and seizures."  U.S. Const., amend. IV.  The first step in Fourth

Amendment analysis in a case alleging an unreasonable seizure is to determine

whether there was a seizure.  *Couture v. Bd. of Educ. of Albuquerque Public Sch.*, 535

F.3d 1243, 1250 (10th Cir. 2008).  It is undisputed in this case that Bethany Fuchs was

not the suspect that defendant Sanders sought to detain.  "A seizure occurs even when

an unintended person or thing is the object of the detention or taking, but the detention

or taking itself must be willful."  *Brower v. County of Inyo*, 489 U.S. 593, 596 (1989)

(citations omitted).  Thus, Bethany Fuchs was seized if, and only if, defendant Sanders'

actions constituted "a governmental termination of [her] freedom of movement *through

means intentionally applied*."  *Id.* at 597 (emphasis in original).

The Court concludes that Bethany Fuchs was not seized within the meaning of

the Fourth Amendment.  First, the evidence shows that defendant Sanders did not

intend to detain Bethany Fuchs.  Defendant Sanders' commands to Mrs. Fuchs were to

detain her – ordering her to get on the ground with her face turned away from him.

9

Defendant Sanders' command to Bethany Fuchs had a different purpose.  Defendant Sanders never ordered Bethany to the ground or told her to stay in a specific spot, nor did he point his gun at her.  Rather, he ordered Bethany to stay clear of her mother so as to be out of his line of sight to Mrs. Fuchs.  If anything, defendant Sanders' command and conduct directed towards Bethany shows a concern for her safety.

Defendant Sanders' actions directed towards Bethany are akin to those of the sheriff in *Clark v. Edmunds*, 513 F.3d 1219 (10th Cir. 2008).  There the sheriff entered a motel room where a mother and her daughter were staying, with the intent to take the daughter in for a mental health examination, based on reports of suicidal ideation.  *Id.* at 1221.  After some delay, the sheriff decided to seize the daughter and take her to his patrol car.  *Id.*  When the mother either resisted this process or found herself in the sheriff's path, the sheriff pushed her aside, causing the mother to collide with furniture in the motel room.  *Id.*  The Tenth Circuit concluded that "[t]he sheriff only intended to remove Plaintiff from his path to the door; he did not intend to acquire physical control over her. Thus, no Fourth Amendment seizure occurred."  *Id.* at 1222.  The same analysis applies in this case – during the encounter with Mrs. Fuchs, defendant Sanders did not intend to detain Bethany Fuchs and, thus, she was not seized.  *See id.*; *see also Childress v. City of Arapaho,* 210 F.3d 1154, 1157 (10th Cir. 2000) (holding that, even though captive passengers of a minivan sustained serious injuries from shots fired on minivan during police pursuit, the police officers "intended to restrain the minivan and the fugitives," not the plaintiffs, and, thus, "[t]he injuries inflicted were the

unfortunate but not unconstitutional 'accidental effects of otherwise lawful conduct'" (quoting *Brower*, 489 U.S. at 596)).

Second, Bethany Fuchs was not seized because she did not comply with defendant Sanders' commands.  In *Bella v. Chamberlain*, 24 F.3d 1251, 1256 (10th Cir.1994), the Tenth Circuit held that firing gunshots at a helicopter piloted by a hostage innocent bystander did not constitute a seizure of the hostage because, although "[t]he shots constituted an assertion of authority, . . . they did not cause [the plaintiff] to submit."  The Tenth Circuit reached a similar holding in *Reeves v. Churchich*, 484 F.3d 1244 (10th Cir. 2007).  There the plaintiffs – a mother and her daughter – argued that they were seized when police officers pointed their guns towards and issued verbal commands to one or both of the plaintiffs during the course of a search of an apartment unit adjacent to the plaintiffs' apartment.  *Id.* at 1251, 1253.  The facts showed that, when confronted with the officers' show of authority, the plaintiffs either did not heed the direction to stay in one location, or refused to return to the apartment, in contravention of the officers' commands.  *Id.* at 1248-50.  The Tenth Circuit held that because neither of the plaintiffs submitted to the officers' "assertions of authority," no seizure occurred. *Id.* at 1253.  The court deemed the plaintiffs' "subjective motives behind their failure to submit" irrelevant to the question of whether a seizure had taken place.  *Id.*

As in *Bella* and *Churchich*, the facts of this case show that Bethany Fuchs did not submit to defendant Sanders' show of authority.  Even after defendant Sanders instructed Bethany Fuchs to either stay away from her mother or go to the van, the evidence shows that Bethany continued to run back and forth while screaming.  Then

she opened the back door of the van without any instruction to do so from defendant Sanders.  These are not the actions of someone who felt their freedom to move was restrained.  Accordingly, the evidence does not show that defendant Sanders ever seized Bethany Fuchs as required for a Fourth Amendment unreasonable seizure claim.

Concomitantly, Bethany Fuchs' excessive force claim fails because she was not subject to a seizure.  *Bella*, 24 F.3d at 1255 ("To state a claim of excessive force under the Fourth Amendment, a plaintiff must show both that a 'seizure' occurred and that the seizure was 'unreasonable'" (citing *Brower*, 489 U.S. at 599)); *see also County of Sacramento v. Lewis*, 523 U.S. 833, 843 (1998) ("The Fourth Amendment covers only 'searches and seizures'").

### 3.  *Vanessa Fuchs' Fourth Amendment Claims*

Defendant Sanders concedes that he seized Mrs. Fuchs under the Fourth Amendment.  Therefore, the issues with respect to Mrs. Fuchs' claims are whether that seizure was reasonable and whether defendant Sanders used excessive force in detaining Mrs. Fuchs.  Mrs. Fuchs' claims are premised on the theory that it was not reasonable for a police officer to point a gun at her or to handcuff her in light of the difference between the description of the suspect aired by the dispatcher and her own physical appearance.  Defendant Sanders asserts that his actions were reasonable under the circumstances, given the match between the license plate of Mrs. Fuchs' vehicle and the victim's report, coupled with defendant Sanders' duty to investigate whether there was any connection between Mrs. Fuchs and the suspect.

"The 'touchstone' of Fourth Amendment analysis 'is always the reasonableness in all the circumstances of the particular governmental invasion of a citizen's personal security.'" *United States v. Oliver*, 363 F.3d 1061, 1066 (10th Cir. 2004) (quoting *Pennsylvania v. Mimms*, 434 U.S. 106, 108-09 (1977) (per curiam)). Under *Graham v. Connor*, 490 U.S. 386, 395 (1989), "claims that law enforcement officers have used excessive force – deadly or not – in the course of an arrest, investigatory stop, or other 'seizure'" are analyzed under the same Fourth Amendment reasonableness standard. The Fourth Amendment reasonableness analysis depends on whether defendant Sanders formally arrested Mrs. Fuchs or only detained her long enough to constitute an investigative stop under *Terry v. Ohio*, 392 U.S. 1 (1968). Specifically, the Supreme Court has recognized on a number of occasions that "some seizures admittedly covered by the Fourth Amendment constitute such limited intrusions on the personal security of those detained and are justified by such substantial law enforcement interests that they may be made on less than probable cause, so long as police have an articulable basis for suspecting criminal activity." *Michigan v. Summers*, 452 U.S. 692, 699 (1981). Thus, where a detainment constitutes an arrest, it is unreasonable unless supported by probable cause. *Id.* at 700. But an investigative stop under *Terry* is reasonable so long as (1) the detention is "justified at its inception" and (2) carried out in a manner that is "reasonably related in scope to the circumstances which justified the interference in the first place." *Terry*, 392 U.S. at 20.

To be "justified at its inception," an investigative detention must be supported by a reasonable basis for suspecting criminal activity. *See Hiibel v. Sixth Judicial Dist.*

13

*Court of Nevada*, 542 U.S. 177, 185 (2004).  In this case, the license plate number of

Mrs. Fuchs' vehicle and the one reported by the victim matched, and Mrs. Fuchs'

vehicle – a blue four door van – met the general vehicle description of a "blue four door

vehicle" that was broadcast over the police radio.  It is therefore beyond dispute that

defendant Sanders possessed a reasonable suspicion of criminal activity at the outset

of his detention of Mrs. Fuchs.  *See*, *e.g.*, *United States v. Lucky*, 569 F.3d 101, 106

(2d Cir. 2009) (holding that police officers "certainly had reasonable suspicion in light of

the fact that the automobile had the same license plate number and description as one

used to flee from a shooting two days earlier").

The question before the Court is therefore whether defendant Sanders' detention

of Mrs. Fuchs exceeded constitutional bounds by either going beyond a reasonable

scope or by constituting a *de facto* arrest without probable cause.  Defendant Sanders

did not formally place Mrs. Fuchs under arrest.  However, "[a]n investigative detention

evolves into an arrest when the scope of police conduct is no longer reasonably related

to the circumstances initially justifying the seizure."  *Manzanares v. Higdon*,  575 F.3d

1135, 1148 (10th Cir. 2009).  "There is no bright-line rule to determine whether the

scope of police conduct was reasonably related to the goals of the stop; rather our

evaluation is guided by common sense and ordinary human experience."  *United States

v. Albert*, --- F.3d ----, 2009 WL 2757038, *3 (10th Cir. Sept. 1, 2009) (quoting *United

States v. Melendez-Garcia*, 28 F.3d 1046, 1052 (10th Cir.1994)).  Accordingly, the

Court turns to the analysis of whether defendant Sanders' detainment of Mrs. Fuchs

14

was reasonably related to the information about the burglary that defendant Sanders received from the dispatcher.

For this analysis, the Court finds two considerations paramount: (1) whether the detention was too long to constitute an investigative stop, and (2) whether the method employed by defendant Sanders – pointing a gun and using handcuffs – was warranted under the totality of the circumstances.  As to the first, "the brevity of the invasion of the individual's Fourth Amendment interests is an important factor in determining whether the seizure is so minimally intrusive as to be justifiable on reasonable suspicion." *United States v. Place*, 462 U.S. 696, 709 (1983); *see also United States v. Edwards*, 103 F.3d 90, 93 (10th Cir. 1996) (citing with approval the district court's statement that "[l]ength of time is the most important consideration in determining whether a restraint is a stop or a full-fledged arrest.").  The Supreme Court has held that in "assessing whether a detention is too long in duration to be justified as an investigative stop," a court should "examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly . . . ."  *United States v. Sharpe*, 470 U.S. 675, 686 (1985).  "A court making this assessment should take care to consider whether the police are acting in a swiftly developing situation, and in such cases the court should not indulge in unrealistic second-guessing."  *Id.*; *see also Albert*, 2009 WL 2757038, *3 ("We avoid unrealistic second-guessing of police officers' decisions in this regard and thus do not require them to use the least intrusive means in the course of a detention, only reasonable ones." (internal quotation marks omitted)).

Under the foregoing standard, the duration of defendant Sanders' detention of Mrs. Fuchs was reasonable under the circumstances.  The entire stop lasted

15

approximately seven minutes.  Defendant Sanders had his gun pointed at Mrs. Fuchs for about forty-five seconds and Mrs. Fuchs was prone on the ground in handcuffs for two to three minutes.  During the first four minutes of the stop, defendant Sanders' actions were directed at gaining control over Mrs. Fuchs and checking her van.  Defendant Sanders checked the van for two purposes reasonably related to an investigative detention.  First, to determine whether there was anyone in the van who could pose a threat to him, and second, to determine if the property taken during the burglary was in the van.  Once defendant Sanders confirmed that neither a person nor golf clubs were in the van, he took steps to investigate whether the license plate number was a misidentification and, upon learning that it was, promptly released Mrs. Fuchs.  Although it may have been possible to complete these steps more quickly, it is not the place of the Court, after the fact, to "imagine some alternative means by which the objectives of the police might have been accomplished."  *Sharpe*, 470 U.S. at 686-87.  Under these circumstances, the investigative stop of Mrs. Fuchs did not last so long as to constitute an arrest.

Turning to the method by which defendant Sanders detained Mrs. Fuchs, it is clear that, during a *Terry* stop, police officers may use force "to the extent that 'such steps [are] reasonably necessary to protect their personal safety and to maintain the status quo during the course of [the] stop.'"  *Novitsky v. City of Aurora*, 491 F.3d 1244, 1254 (10th Cir. 2007) (quoting *United States v. Hensley*, 469 U.S. 221, 235 (1985)).  "Under certain circumstances, the steps officers may permissibly take to protect their safety include drawing their weapons, placing a suspect in handcuffs, or forcing a suspect to the ground."  *Id.*; *see also United States v. Perdue*, 8 F.3d 1455, 1463 (10th

Cir. 1993) (recognizing trend among federal courts allowing police to use handcuffs or place suspects on the ground during a *Terry* stop when the officers have reason to be concerned for their safety); *Holland*, 268 F.3d at 1192 (holding that police officers' display of weapons "should be predicated on at least a perceived risk of injury or danger to the officers or others, based upon what the officers know at that time").

"It is beyond dispute that the safety of law enforcement officers during the performance of their duties is a 'legitimate and weighty' concern." *Novitsky*, 491 F.3d at 1254 (quoting *Mimms*, 434 U.S. at 110).  The Tenth Circuit has particularly emphasized officer safety concerns in the context of traffic stops.  *See, e.g.*, *United States v. Holt*, 264 F.3d 1215, 1222 (10th Cir. 2001) (en banc) ("The Supreme Court has found it 'too plain for argument' that the government's interest in officer safety is 'both legitimate and weighty,' given the 'inordinate risks confronting an officer as he approaches a person seated in an automobile.'" (quoting *Mimms*, 434 U.S. at 110)).  Explaining this concern for officer safety in the traffic stop context, the Tenth Circuit stated:

> The terrifying truth is that officers face a very real risk of being assaulted with a dangerous weapon each time they stop a vehicle.  The officer typically has to leave his vehicle, thereby exposing himself to potential assault by the motorist.  The officer approaches the vehicle not knowing who the motorist is or what the motorist's intentions might be.  It is precisely during such an exposed stop that the courts have been willing to give the officers "wide latitude," to discern the threat the motorist may pose to officer safety.

*Holt*, 264 F.3d at 1223 (citation omitted).  Thus, even during a routine traffic stop, an officer is permitted to "order the driver and passengers out of the vehicle" and to "order the occupants to raise their hands during the stop."  *Id.*

Bearing in mind the foregoing authorities, the Court evaluates whether the particular precautionary steps taken by defendant Sanders were reasonable under an objective standard: "would the facts available to [defendant Sanders] at the moment of the seizure warrant a man of reasonable caution in the belief that the action taken was appropriate." *Novitsky*, 491 F.3d at 1254 (quoting *Gallegos v. City of Colorado Springs*, 114 F.3d 1024, 1030-31 (10th Cir. 1997)) (alterations omitted). Moreover, *Graham v. Connor*, 490 U.S. at 396, counsels that "[t]he 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."

The Court first addresses defendant Sanders' pointing of his handgun. On this question, the Court finds guidance in the Tenth Circuit's decision in *Holland*. The Tenth Circuit held that pointing a firearm directly at a person may be reasonable when it is predicated "on at least a perceived risk of injury or danger to the officer[] or others . . . ." *Holland*, 268 F.3d at 1192. The *Holland* court further held that when a person submits to the officer's show of force, and the officer has "no reasonable cause to believe that person poses a danger to the officer or to others, it may be excessive and unreasonable to continue to aim a loaded firearm directly at that person, in contrast to simply holding the weapon in a fashion ready for immediate use." *Id.* at 1193.

In evaluating the reasonableness of defendant Sanders' use of his handgun, it is necessary to consider the beginning of the encounter. Defendant Sanders heard the radio dispatch regarding the burglary at 11:00 a.m. He then went to the address where the suspect vehicle was registered. Defendant Sanders was alone in his patrol car.

18

Within minutes after arriving at that address, a vehicle with the same license plate as the suspect vehicle pulled into the driveway.  The temporal proximity to the burglary, combined with the fact that the occupant or occupants of the van were probably going to get out of the van after it stopped in the driveway, justified defendant Sanders in exercising great caution to protect himself.  Although Mrs. Fuchs' height differs significantly from the description aired on the police broadcast, defendant Sanders was responding to a quickly developing situation – what appeared to be confrontation with a burglar who had just evaded capture by a homeowner.  Moreover, even after defendant Sanders had a better opportunity to view Mrs. Fuchs, until he had an opportunity to check the van, he had reason to believe that the driver, while not matching the description, was possibly associated with the burglary.

To say that it was unreasonable for defendant Sanders to draw and point his firearm would cross the bounds of post hoc evaluation proscribed by the Supreme Court in *United States v. Sharpe*, 470 U.S. at 686-87.  As the Tenth Circuit emphasized in *Holt*, defendant Sanders had reasonable grounds to fear that the occupants of the minivan – seen and unseen – presented a risk to his safety.  264 F.3d at 1223 ("An officer in today's reality has an objective, reasonable basis to fear for his or her life every time a motorist is stopped.  Every traffic stop, after all, is a confrontation.").  This concern was considerably heightened because this was not a traffic stop based on a driving infraction, but rather what appeared to be a burglary suspect who was about ready to confront a police officer.  Additionally, defendant Sanders' conduct did not run afoul of the Tenth Circuit's opinion in *Holland*, 268 F.3d at 1193, since there is no

evidence that he continued to point his gun at Mrs. Fuchs after he had neutralized any risk she presented by placing her in handcuffs.

The Court further concludes that defendant Sanders' use of handcuffs on Mrs. Fuchs was a reasonable response to a perceived risk.  It was not until defendant Sanders had checked the cargo portion of the van that he could be sure that the male suspect was not hidden there.  Rather than patting Mrs. Fuchs down to ascertain whether she had a weapon, defendant Sanders used the handcuffs to restrain her and thereby give himself the ability to turn his back on her while he looked in the cargo area of the van.  Because an officer at that point in time could have thought that the van still posed a threat to his safety, defendant Sanders' use of handcuffs was reasonable.  *See Williams v. City of Champaign*, 524 F.3d 826, 828 (7th Cir. 2008) (holding that, where officers had received no information about whether robber was armed or unarmed, it was reasonable for police officers to point their guns at and handcuff occupants of a van with the same license plate number as vehicle reportedly used by robber to flee).

Moreover, Mrs. Fuchs did not identify in her response brief any injury she sustained from her encounter with defendant Sanders.  *See* Resp., Add'l Undisputed Facts ¶¶ 10-11.  In *Cortez v. McCauley*, 478 F.3d 1108, 1129 (10th Cir. 2007) (en banc), the Tenth Circuit held that "a claim of excessive force requires some actual injury that is not de minimis, be it physical or emotional."  To the extent that Mrs. Fuchs stakes her claim of excessive force on being handcuffed for the time period when defendant Sanders was communicating with other police officers to confirm the details of the victim's report, she has not shown any more than *de minimis* injuries in that

regard.  Based on the Tenth Circuit's decision in *Cortez*, Mrs. Fuchs' lack of a direct physical or emotional injury further warrants entry of summary judgment in defendant Sanders' favor on her excessive force claim.  *See Williams*, 524 F.3d at 829 (rejecting claim that handcuffs "should have been removed a few minutes sooner," in part, because "the brevity of the restraint defeats [the plaintiff's] claim of damages").

For the forgoing reasons, Mrs. Fuchs has not met her burden to "show with particularity facts and law establishing the inference that defendant violated a constitutional right" and that the right allegedly violated was "clearly established at the time of the conduct at issue."  *Hollingsworth*, 110 F.3d at 737-38.  Defendant Sanders is therefore entitled to qualified immunity.

### 4.  Official Capacity Claims

In addition to their claims directed at defendant Sanders individually, plaintiffs also alleged claims against him "in his official capacity"[2] and argued in their brief and at oral argument that his conduct evinces a failure to train for which Arapahoe County can be held liable.  "A municipality can be found liable under § 1983 only where the municipality *itself* causes the constitutional violation at issue.  *Respondeat superior* or vicarious liability will not attach under § 1983."  *City of Canton v. Harris*, 489 U.S. 378, 385 (1989) (citing *Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658, 694-95, 698 (1978)).  In order to hold Arapahoe County liable under § 1983, plaintiffs must prove that "(1) a municipal employee committed a constitutional violation, and (2) a

---

[2]  "[A section 1983] suit against a municipality and a suit against a municipal official acting in his or her official capacity are the same."  *Myers v. Oklahoma County Bd. of County Comm'rs*, 151 F.3d 1313, 1316 n.2 (10th Cir. 1998) (quoting *Watson v. City of Kansas City*, 857 F.2d 690, 695 (10th Cir.1988)).

municipal policy or custom was the moving force behind the constitutional deprivation."

*Myers*, 151 F.3d at 1318 (citing *Monell*, 436 U.S. at 694).  Plaintiffs' failure to show that

defendant Sanders violated their constitutional rights defeats any municipal liability

claim.  *See Martinez v. Beggs*, 563 F.3d 1082, 1091 (10th Cir. 2009) ("A county or

sheriff in his official capacity cannot be held "liable for constitutional violations when

there was no underlying constitutional violation by any of its officers." ).  Even if they

had demonstrated a constitutional violation, plaintiffs' municipal liability claim premised

on an alleged failure to train would fail because they proffered no evidence of a

widespread deficiency in the training of police officers in Arapahoe County.  The fact

"[t]hat a particular officer may be unsatisfactorily trained will not alone suffice to fasten

liability on the city . . . ."  *City of Canton*, 489 U.S. at 390.  Thus, plaintiffs' municipal

liability claim cannot go forward.

## III.  CONCLUSION

For the foregoing reasons, it is

**ORDERED** that defendant Anthony Sanders' motion for summary judgment

[Docket No. 35] is GRANTED.  It is further

**ORDERED** that this matter, and all claims asserted therein, is dismissed with prejudice. The Clerk shall forthwith enter judgment in favor of defendant Anthony Sanders and against plaintiffs Vanessa Fuchs and Bethany Fuchs.

DATED September 22, 2009.

BY THE COURT:

s/Philip A. Brimmer
PHILIP A. BRIMMER
United States District Judge